M. Anderson Berry (SBN 262879)
Leslie Guillon (SBN 222400)
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
aberry@justice4you.com
lguillon@justice4you.com

John Yanchunis (*Pro Hac Vice Forthcoming*)
Ryan J. McGee (*Pro Hac Vice Forthcoming*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 559-4908
Facsimile: (813) 223-5402
jyanchunis@ ForThe People.com
rmcgee@ForThe People.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNA HOROWITZ, DEBRA PALMER, and ANNABELLE GONZALES, on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>RADNET, INC., a Delaware Corporation,<br><br>　　　　　　Defendant. | Case No.: _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

　　　　Plaintiffs Donna Horowitz, Debra Palmer, and Annabelle Gonzales ("Plaintiffs") bring this Class Action Complaint against RadNet, Inc. ("Defendant"), in their respective individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I.　　INTRODUCTION

　　　　1.　　RadNet is a provider of outpatient, diagnostic imaging services, with locations in California and across the nation. RadNet was founded in 1984 as a small radiology imaging center in Los Angeles. Now, with over 332 imaging centers and thousands of current and former employees, RadNet's estimated annual revenues exceed $1 billion.

2.      On or about September 18, 2020, RadNet notified various states' Attorneys General that it experienced a security breach involving sensitive personally identifiable information ("PII") of current and former employees.[1] The exposed PII included current, former and potential employees' names, dates of birth and Social Security Numbers, and in some cases included driver's license and/or passport numbers (the "Data Breach").

3.      RadNet admits that "[t]he outside actor began to exfiltrate information from [RadNet's] server on July 18, 2020,"[2] but RadNet does not clarify when the Data Breach stopped; it claims the breach stopped before RadNet reported it in late September 2020. It is possible that RadNet waited months before notifying affected employees that their PII was stolen.

4.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect employees' PII.

5.      Defendant disregarded the rights of Plaintiffs and Class members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have reasonable or adequately robust computer systems and security practices to safeguard employees' PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and Class members prompt and accurate notice of the Data Breach.

6.      As a result of Defendant's failure to implement and follow reasonable security procedures, Defendant's current and former employees' PII is now in the hands of thieves.

---

[1] *See, e.g., RadNet's Notice of Security Breach to New Hampshire's Attorney General*, dated Sept. 18, 2020, *available at:* https://www.doj.nh.gov/consumer/security-breaches/documents/radnet-20200918.pdf (last accessed Nov. 11, 2020); RadNet's *Notice of Data Breach*, archived by the California's Attorney General, dated Sept. 21, 2020, *available at:* https://oag.ca.gov/system/files/Radnet%20Consumer%20Notice%20%282%29.pdf (last accessed on Nov. 11, 2020). On information and belief, the Data Breach affected current and former RadNet employees, as well as persons applying for positions at RadNet entities.

[2] *Id.*

Plaintiffs and Class members have had to spend, and will continue to spend, significant amounts of time and money in an effort to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and fraud—especially with Defendant's loss of their Social Security Numbers and similar sensitive and confidential information. Plaintiffs, on behalf of all others similarly situated, allege claims for negligence; breach of implied contract; breach of confidence; violation of California's Unfair Competition Law; and violation of California's Consumer Privacy Act. Plaintiffs and the Class members seek to compel Defendant to adopt reasonably sufficient security practices to safeguard current and former employees' PII that remains in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future.

## II.   PARTIES

7.     Plaintiff Donna Horowitz is a resident of Fort Pierce, Florida. On or about September 21, 2020, Plaintiff Horowitz received notice from RadNet that it improperly exposed her PII to unauthorized third parties. Ms. Horowitz worked for a RadNet entity in the 1990's and ceased that employment in 1999.

8.     Plaintiff Debra Palmer is a resident of Arvada, Colorado. On or about September 21, 2020, Plaintiff Palmer received notice from RadNet that it improperly exposed her PII to unauthorized third parties. Ms. Palmer applied for employment with a RadNet entity within the last five years, but was never employed by RadNet or any of its entities.

9.     Plaintiff Annabelle Gonzales is a resident of Inglewood, California. On or about September 21, 2020, Plaintiff Gonzales received notice from RadNet that it improperly exposed her PII to unauthorized third parties. Ms. Gonzales worked for RadNet from 2005 through 2016.

10.     Defendant RadNet, Inc., is a Delaware Corporation headquartered in Los Angeles, California. RadNet owns and operates over 332 outpatient diagnostic imaging centers in at least seven states, including California.

## III.   JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive

of interest and costs, there are more than 100 members in the proposed class. Moreover, this Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because Plaintiff Horowitz is a Florida citizen and Plaintiff Palmer is a Colorado citizen, and therefore diverse from Defendant, which is not a Florida or Colorado citizen.

12.     Plaintiffs' PII was maintained by Defendant in this District where also the Data Breach occurred which led to them sustaining damage. Through its business operations in this District, RadNet intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District. RadNet is based in this District, maintains employees' PII in the District and has caused harm to Plaintiffs and Class members residing in this District.

## IV.     STATEMENT OF FACTS

### A.   *Background.*

14.     RadNet was founded in 1984 as a small outpatient diagnostic imaging service in Los Angeles. Over the years, RadNet acquired similar imaging facilities across the country, including Arizona, New Jersey, New York, Delaware, Maryland, and Florida.

15.     RadNet is publicly traded on Nasdaq (RDNT), and has quadrupled in size since 2006. With at least 332 locations, more than 500 radiologists, and approximately 7,100 current employees, over the last 36 years RadNet has had tens of thousands of employees.

16.     Plaintiffs and Class Members applied for employment with RadNet, requiring them to provide some of their most sensitive and confidential information, including names, dates of birth, Social Security Numbers, and other personal identifiable information which is static, does not change, and can be used to commit myriad financial crimes.

**B.  The Data Breach.**

17.     Beginning on or about September 18, 2020, RadNet sent numerous states' Attorneys General a *Notice of Security Breach*. RadNet's outside counsel at Perkins Coie informed the Attorneys General:

> I am writing on behalf of RadNet, Inc. to inform you of a recent security breach incident involving an unknown third party that gained access to a RadNet server that was used to store certain employee data. **The outside actor began to exfiltrate information from this server on July 18, 2020**. Related activity by the actor triggered alerting in RadNet's systems, and RadNet immediately blocked further access to the files and its systems. It was shortly thereafter able to locate and retrieve the copied files.
>
> […] **The personal information involves, for most, name, social security number, and birthdate**. In a small percentage of cases[,] documents included additional information such as **driver's license and/or passport number**. [(emphasis added.)][3]

18.     Beginning on or about September 21, 2020, David Katz, RadNet's Executive Vice President & General Counsel, notified RadNet's affected current and former employees the following:

> **What Happened?**
> I am writing to let you know of an incident that may have affected your personal information. On July 18, an unknown third party gained access to a RadNet server that was used to store certain employee data, and copied certain files to an external server. RadNet quickly discovered this activity and blocked further access to the files and its systems and retrieved the copied files.
>
> **What Information Was Involved?**
> Your name, social security number, driver's license number, and potentially additional data such as your date of birth, address, and passport number, may have been among the information accessed.
>
> **What Are We Doing?**
> RadNet quickly identified and prevented further activity from the third party. We have retained an outside cybersecurity firm to support our response, including measures to prevent similar activity in the future. We have also informed the credit reporting agencies

---

[3] RadNet's *Notice of Security Breach to New Hampshire's Attorney General*, dated Sept. 18, 2020, *available at*: https://www.doj.nh.gov/consumer/security-breaches/documents/radnet-20200918.pdf (last accessed Nov. 11, 2020).

about this incident so that they may take appropriate action regarding your credit report file.[4]

19.    Defendant's notice to affected employees was no clearer than the notice to the Attorneys General about the timeline: it did not provide a date on which RadNet allegedly stopped the Data Breach. Moreover, although RadNet was clear that the Data Breach involved exfiltrated driver's licenses in some cases, the notice to affected employees did not mention that important aspect of the Data Breach.

20.    RadNet's employees' PII has been accessed, copied, and compromised by third parties and malicious actors and Plaintiffs—who have not had a relationship with RadNet for years, if not longer—did not authorize the dissemination thereto.

C.    *Plaintiffs' Efforts to Secure Their PII*

*Plaintiff Horowitz*

21.    Upon receiving Notice from RadNet on or about September 21, 2020,[5] Plaintiff Horowitz researched her options to respond to the theft of her name and Social Security Number and she contacted her bank to change her known financial information. She spent and continues to spend additional time reviewing her credit monitoring service results and reports from other online resources concerning the security of her identity and financial information. This is time Plaintiff Horowitz otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

22.    Knowing that thieves stole her PII, including her Social Security Number and potentially her driver's license number, and knowing that her PII will be sold on the dark web, has caused Plaintiff Horowitz great anxiety. Previously, Ms. Horowitz's husband's Social Security Number was stolen, resulting in his identity being stolen and used – costing her and her

---

[4] RadNet's *Notice of Data Breach*, archived by the California's Attorney General, dated Sept. 21, 2020, *available at:* https://oag.ca.gov/system/files/Radnet%20Consumer%20Notice%20%282%29.pdf (last accessed on Nov. 11, 2020).

[5] The notice from RadNet was addressed to Ms. Horowitz's maiden name at her current address.

husband thousands of dollars in federal tax liabilities, for which they were never reimbursed. With this experience, she is now very concerned about her identity being stolen and suffering the same tax liabilities and other financial crimes.

23.     Additionally, Plaintiff Horowitz has not been involved in any data breaches, and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. She deletes any and all electronic documents containing her PII, and destroys any documents that contain any of her PII, or that may contain any information that could otherwise be used to compromise her PII.

24.     Plaintiff Horowitz suffered actual injury from having her PII exposed as a result of the Data Breach including, but not limited to: (a) damages to and diminution in the value of her PII—a form of intangible property that the Plaintiff Horowitz entrusted to RadNet as a condition of her employment; (b) loss of her privacy; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

25.     As a result of the Data Breach, Plaintiff Horowitz will continue to be at heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

### *Plaintiff Palmer*

26.     Upon receiving Notice from RadNet on or about September 21, 2020, Plaintiff Palmer researched her options to respond to the theft of her name and Social Security Number; she contacted her banks to notify them of the Data Breach; and Ms. Palmer contacted the credit bureaus to place credit freezes. She spent and continues to spend additional time reviewing her credit monitoring service results and reports from other online resources concerning the security of her identity and financial information. This is time Plaintiff Palmer otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

27.     Knowing that thieves stole her PII, including her Social Security Number and potentially her driver's license number, and knowing that her PII will be sold on the dark web, has caused Plaintiff Palmer great anxiety.

28.     Additionally, Plaintiff Palmer is not aware of having been involved in any data breaches. Plaintiff Palmer has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. She deletes any and all electronic documents containing her PII, does not open suspicious emails or texts, and destroys any documents that contain any of her PII.

29.     Plaintiff Palmer suffered actual injury from having her PII exposed as a result of the Data Breach including, but not limited to: (a) damages to and diminution in the value of her PII—a form of intangible property that the Plaintiff Palmer entrusted to RadNet when she applied for employment; (b) loss of her privacy; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

30.     As a result of the Data Breach, Plaintiff Palmer will continue to be at heightened risk for financial fraud, identity theft, other forms of fraud and the attendant damages, for years to come.

### Plaintiff Gonzales

31.     Upon receiving Notice from RadNet on or about September 21, 2020, Plaintiff Annabelle Gonzales researched her options to respond to the theft of her name and Social Security Number; she contacted her bank to notify it of the Data Breach. She spent and continues to spend additional time reviewing her results and reports from online resources concerning the security of her identity and financial information. This is time Plaintiff Gonzales otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

32.     Knowing that thieves stole her PII, including her Social Security Number and potentially her driver's license number, and knowing that her PII will be sold on the dark web, has caused Plaintiff Palmer great anxiety.

33.     Additionally, Plaintiff Gonzales is not aware of having been involved in any data breaches. Plaintiff Gonzales has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. She deletes any and all electronic documents containing her PII, does not open suspicious emails or texts, and destroys any documents that contain any of her PII. She has no social media accounts and avoids purchasing products and services online.

34.     Plaintiff Gonzales suffered actual injury from having her PII exposed as a result of the Data Breach including, but not limited to: (a) damages to and diminution in the value of her PII—a form of intangible property that the Plaintiff Gonzales entrusted to RadNet as a condition of her employment; (b) loss of her privacy; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

35.     As a result of the Data Breach, Plaintiff Gonzales will continue to be at heightened risk for financial fraud, identity theft, other forms of fraud and the attendant damages, for years to come.

### D.  RadNet Acquires, Collects and Stores Plaintiffs' and Class Members' PII.

36.     RadNet acquires, collects, and stores its employees' PII.

37.     As a condition of applying for and maintaining employment with RadNet, RadNet requires that its employees entrust it with highly confidential PII.

38.     By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, RadNet assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

39.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and the Class Members, as current and former employees, relied on RadNet to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### E.  The Value of PII and the Effects of Unauthorized Disclosure.

40.     RadNet was well aware that the PII it collects, stores, and maintains is highly sensitive and of significant value to those who would use it for wrongful purposes.

41.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to

$200, and bank details have a price range of $50 to $200.[6] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[7] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[8]

42.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[9]

43.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[6] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Nov. 11, 2020).

[7] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Nov. 11, 2020).

[8] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Nov. 11, 2020).

[9] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at:* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 11, 2020).

44.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[10]

45.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, driver's license number, passport number, name, date of birth, and addresses.

46.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[11]

47.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

48.     The fraudulent activity resulting from the Data Breach may not come to light for years.

49.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

[L]aw enforcement officials told us that in some cases, stolen data

---

[10] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Nov. 11, 2020).

[11] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 11, 2020).

> may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[12]

50.     At all relevant times, RadNet knew, or reasonably should have known, of the importance of safeguarding its current and former employees' PII, including Social Security numbers and dates of birth, and of the foreseeable consequences that would occur if RadNet's data security system was breached, including, specifically, the significant costs that would be imposed on RadNet's current and former employees as a result of a breach.

51.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

52.     RadNet was, or should have been, fully aware of the unique type and the significant volume of data it collected, amounting to thousands of individuals' detailed, PII and thus, the significant number of individuals who would be harmed by RadNet's loss of that unencrypted data.

53.     The injuries to Plaintiffs and Class Members were directly and proximately caused by RadNet's failure to implement or maintain adequate data security measures for its current and former employees' PII.

### F. RadNet Failed to Comply with FTC Guidelines.

54.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[13]

---

[12] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last visited Nov. 11, 2020).

[13] Federal Trade Commission, *Start With Security*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Nov. 11, 2020).

55.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[14] The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

56.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[15]

57.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect personal data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential personal data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

58.     RadNet failed to properly implement basic data security practices. RadNet's failure to employ reasonable and appropriate measures to protect against unauthorized access to current and former employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

59.     RadNet was at all times fully aware of its obligation to protect the PII of current and former employees because of its position as a trusted employer. RadNet was also aware of the significant repercussions that would result from its failure to do so.

---

[14] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Nov. 11, 2020).

[15] FTC, *Start With Security*, *supra* note 16.

### G.  Plaintiffs and Class Members Suffered Damages.

60.     The ramifications of Defendant's failure to keep current and former employees' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.[16]

61.     The PII belonging to Plaintiffs and Class Members is private, sensitive in nature, and was left inadequately protected by Defendant who did not obtain Plaintiffs' or Class Members' consent to disclose such PII to any other person as required by applicable law and industry standards.

62.     The Data Breach was a direct and proximate result of RadNet's failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

63.     Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect current and former employees' PII.

64.     Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of PII.

65.     As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

---

[16] *2014 LexisNexis True Cost of Fraud Study, available at:*
https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed Nov. 11, 2020).

66.     The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[17]

67.     As a result of the Defendant's failures to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of suffering:

a.     The compromise, publication, theft, and/or unauthorized use of their PII;

b.     Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

c.     Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

d.     The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in its possession; and

e.     Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

68.     In addition to a remedy for the economic harm, Plaintiffs and the Class Members maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

---

[17] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last accessed Nov. 11, 2020).

**H. RadNet's Delay in Identifying & Reporting the Breach Caused Additional Harm.**

69.     Although their PII was improperly exposed in or about July 18, 2020, affected current and former employees were not notified of the Data Breach until two months later, on or about September 18, 2020, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

70.     As a result of RadNet's delay in detecting and notifying current and former employees of the Data Breach, the risk of fraud for Plaintiffs and Class Members has been driven even higher.

**V.      CHOICE OF LAW**

71.     Defendant is headquartered in Los Angeles, California. That is the nerve center of Defendant's business activities—the place where high-level officers direct, control, and coordinate Defendant's activities, including data security, and where: (a) major policy; (b) advertising; (c) distribution; (d) accounts receivable departments; and (e) financial and legal decisions originate.

72.     Data security assessments and other IT duties related to computer systems and data security occur at Defendant's California headquarters. Furthermore, Defendant's response, and corporate decisions surrounding such response, to the Data Breach were made from and in California. Finally, Defendant's breach of its duty to employees—including Plaintiffs and Class and Subclass members—emanated from California.

73.     It is appropriate to apply California law extraterritorially to the claims against Defendant in this case due to Defendant's significant contacts with California. Defendant is headquartered in California; the relevant decisions, actions, and omissions were made in California; and Defendant cannot claim to be surprised by application of California law to regulate its conduct emanating from California.

74.     To the extent California law conflicts with the law of any other state that could apply to Plaintiffs' claims against Defendant, application of California law would lead to the most predictable result, promote the maintenance of interstate order, simplify the judicial task, and advance the forum's governmental interest.

# VI.   CLASS ALLEGATIONS

75.   Plaintiffs brings this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

76.   The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose PII was compromised in the data breach first announced by RadNet on or about September 18, 2020 (the "Nationwide Class").

77.   The California Subclass is defined as follows:

> All persons residing in California whose PII was compromised in the data breach first announced by RadNet on or about September 18, 2020 (the "California Subclass").

78.   Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

79.   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

80.   <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class and California Subclass are so numerous that joinder of all members is impracticable. Defendant has identified thousands of current and former employees whose PII may have been improperly accessed in the Data Breach, and the Classes are identifiable within Defendant's records.

81.   <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

> a.   When Defendant actually learned of the Data Breach and whether its response was adequate;
>
> b.   Whether Defendant owed a duty to the Classes to exercise due care in

collecting, storing, safeguarding and/or obtaining their PII;

c.   Whether Defendant breached that duty;

d.   Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class Members' PII;

e.   Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiffs' and Class Members' PII;

f.   Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiffs' and Class Members' PII secure and prevent loss or misuse of that PII;

g.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.   Whether Defendant caused Plaintiffs' and Class Members' damages;

i.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

j.   Whether Plaintiffs and Class Members are entitled to actual damages, credit monitoring, and other monetary relief;

k.   Whether Defendant violated the California Unfair Competition Law (Business & Professions Code § 17200, *et seq.*); and

l.   Whether Defendant violated the California Consumer Protection Act (California Civil Code § 1798.100, *et seq.*).

82.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

83.   <u>Policies Generally Applicable to the Classes</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Classes Members, and making final injunctive relief appropriate

with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Classes Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

84.     <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Classes in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Classes. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Classes and the infringement of the rights and the damages they have suffered are typical of other Members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

85.     <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

86.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class Members and will establish the right of each Class

Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

87.   RadNet is based in Los Angeles, California, and on information and belief, all managerial decisions emanate from there, the misrepresentations and omissions originated from California, and therefore application of California law to the Nationwide Class is appropriate.

88.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Members of the Classes demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

89.   Adequate notice can be given to Members of the Classes directly using information maintained in Defendant's records.

90.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Members of the Classes, Defendant may continue to refuse to provide proper notification to Members of the Classes regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

91.   Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Members of the Classes as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

92.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b.   Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c.   Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.   Whether Plaintiff and Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## COUNT I
### Negligence
**(On Behalf of Plaintiffs and the Nationwide Class)**

93.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 92 as though fully stated herein.

94.   As a condition of applying for and maintaining employment with RadNet, Plaintiffs and Class Members were obligated to provide RadNet their PII.

95.   Plaintiffs and Class Members entrusted their PII to RadNet with the understanding that RadNet would safeguard their information.

96.   Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

97.   Defendant had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining and testing its security protocols to ensure that PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on relevant cybersecurity measures.

98.   Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance

of providing adequate security of that PII, the current cyber scams being perpetrated, and that it had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiffs and the Class.

99.     Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein.

100.     Plaintiffs and the Class Members had no ability to protect their PII that was in RadNet's possession.

101.     Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

102.     Defendant had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiffs' and Class Members' PII.

103.     Defendant has admitted that Plaintiffs' and Class Members' PII was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

104.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding the Plaintiffs' and Class Members' PII while it was within RadNet's possession or control.

105.     Defendant improperly and inadequately safeguarded Plaintiffs' and Class Members' PII in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

106.      Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former employees' PII.

107.     Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

108.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' PII would not have been compromised.

109.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered, by Plaintiffs and the Class.

110.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as RadNet, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

111.    RadNet violated Section 5 of the FTC Act by failing to use reasonable measures to protect employees' PII and not complying with applicable industry standards, as described in detail herein. RadNet's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

112.    RadNet's violation of Section 5 of the FTC Act constitutes negligence *per se*.

113.    Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

114.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

115.    As a result of  Defendant's negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendant's

possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

## COUNT II
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Nationwide Class)

116.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 92 as though fully stated herein.

117.    Plaintiffs and Class Members were required to provide their PII, including their names, Social Security numbers, dates of birth, and sensitive and confidential information to Defendant as a condition of their applying for and maintaining employment with Defendant.

118.    Plaintiffs and Class Members were required to provide their PII when they applied for and maintained employment with Defendant (or the entities that Defendant subsequently acquired), and implied in that exchange of information was Defendant's promise to protect their PII from unauthorized disclosure.

119.    Further implicit in this agreement between Plaintiffs and Class Members and the Defendant was Defendant's obligation to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard that PII; (c) prevent unauthorized disclosures of the PII; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; and (e) retain the PII only under conditions that kept such information secure and confidential.

120.    Without such implied contracts, Plaintiffs and Class Members would not have provided their PII to and applied for and maintained employment with Defendant.

121.    Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendant, however, Defendant did not.

122.    Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' PII, which was compromised as a result of the Data Breach.

123.     As a direct and proximate result of RadNet's breach of the implied contracts, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

## COUNT III
### Breach of Confidence
### (On Behalf of Plaintiffs and the Nationwide Class)

124.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 92 as though fully stated herein.

125.     At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' PII that Plaintiffs and Class Members provided to Defendant.

126.     As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed the unauthorized third parties.

127.     Plaintiffs and Class Members provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized parties.

128.     Defendant voluntarily received in confidence Plaintiffs' and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

129.     Due to Defendant's failure to prevent, detect, and avoid the Data Breach from occurring by, *inter alia*, following best information security practices to secure Plaintiffs' and Class Members' PII, Plaintiffs' and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

130.     As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

131.     But for Defendant's disclosure of Plaintiffs' and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII, as well as the resulting damages.

132.     The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII. Defendant knew its computer systems and technologies for accepting and securing Plaintiffs' and Class Members' PII had numerous security and other vulnerabilities that placed Plaintiffs' and Class Members' PII in jeopardy.

133.     As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to

undertake appropriate and adequate measures to protect the PII in its continued possession; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

**COUNT IV**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200,** *et seq.***)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

134.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 92 as though fully stated herein.

135.   By reason of the conduct alleged herein, Defendant engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 *et seq.*

136.   Defendant stored the PII of Plaintiffs and all Class members in its computer systems. Defendant falsely represented and omitted to Plaintiffs and all Class members that their PII was secure and would remain private.

137.   Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations and that would have kept Plaintiffs' and all Class members' PII secure and prevented the loss or misuse of that PII.

138.   Even without these misrepresentations, Plaintiffs and all Class members were entitled to assume, and did assume, that Defendant would take appropriate measures to keep their PII safe. Defendant did not disclose at any time that Plaintiffs' and all Class members' PII was vulnerable to hackers because Defendant's data security measures were inadequate and outdated, and Defendant was the only one in possession of that material information, which it had a duty to disclose.

**A.     Unlawful Business Practices**

139.   As noted above, Defendant violated Section 5(a) of the FTC Act (which is a predicate legal violation for this UCL claim) by misrepresenting, both by affirmative conduct and

1  by omission, the safety of its computer systems, specifically the security thereof, and its ability to

2  safely store Plaintiffs' and all Class members' PII.

3     140.   Defendant also violated Section 5(a) of the FTC Act by failing to implement

4  reasonable and appropriate security measures or follow industry standards for data security, and

5  by failing to timely` notify Plaintiffs and all Class members of the Data Breach.

6     141.   If Defendant had complied with these legal requirements, Plaintiffs and all Class

7  members would not have suffered the damages related to the Data Breach, and consequently from

8  Defendant's failure to timely notify Plaintiffs and all Class members of the Data Breach.

9     142.   Defendant's acts, omissions, and misrepresentations as alleged herein were

10  unlawful and in violation of, *inter alia*, Section 5(a) of the FTC Act.

11     143.   Plaintiffs and all Class members suffered injury in fact and lost money or property

12  as the result of Defendant's unlawful business practices. In addition, Plaintiffs and all Class

13  members' PII was taken and is in the hands of those who will use it for their own advantage, or is

14  being sold for value, making it clear that the hacked information is of tangible value. Plaintiffs

15  and all Class members have also suffered consequential out of pocket losses for procuring credit

16  freeze or protection services, identity theft monitoring, and other expenses relating to identity theft

17  losses or protective measures.

18  **B.   Unfair Business Practices**

19     144.   **Defendant engaged in unfair business practices under the "balancing test."**

20  The harm caused by Defendant's actions and omissions, as described in detail above, greatly

21  outweigh any perceived utility. Indeed, Defendant's failure to follow basic data security protocols

22  and misrepresentations to current and former employees, as well as employment candidates who

23  are required to provide PII to be considered, about Defendant's data security cannot be said to

24  have had any utility at all. All of these actions and omissions were clearly injurious to Plaintiffs

25  and all Class members, directly causing the harms alleged below.

26     145.   **Defendant engaged in unfair business practices under the "tethering test."**

27  Defendant's actions and omissions, as described in detail above, violated fundamental public

28  policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The

Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

146. **Defendant engaged in unfair business practices under the "FTC test."** The harm caused by Defendant's actions and omissions, as described in detail above, is substantial in that it affects hundreds of thousands of Class members and has caused those persons to suffer actual harms. Such harms include a substantial risk of identity theft, disclosure of Plaintiffs' and all Class members' PII to third parties without their consent, diminution in value of their PII, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiffs' and all Class members' PII remains in Defendant's possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendant's actions and omissions violated Section 5(a) of the Federal Trade Commission Act. *See* 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); *see also, e.g.*, *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

147. Plaintiffs and all Class members suffered injury in fact and lost money or property as the result of Defendant's unfair business practices. Plaintiffs and all Class members' PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiffs and all Class members have also suffered consequential out of pocket losses for procuring credit freeze or

protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

148.    As a result of Defendant's unlawful and unfair business practices in violation of the UCL, Plaintiffs and all Class members are entitled to damages, injunctive relief, and reasonable attorneys' fees and costs.

### COUNT V
**Violation of California's Consumer Privacy Act**
**(Cal. Civ. Code § 1798.150)**
**(On behalf of Plaintiff Gonzalez and the California Subclass)**

149.    Plaintiff Gonzalez repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 92 as though fully stated herein.

150.    Defendant violated section 1798.150(a) of the California Consumer Privacy Act ("CCPA") by failing to prevent Plaintiff's and California Subclass members' PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII of Plaintiff and California Class members.

151.    As a direct and proximate result of Defendant's acts, Plaintiff's and the California Subclass members' PII was subjected to unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' violation of the duty.

152.    As a direct and proximate result of Defendant's acts, Plaintiff and the California Subclass members were injured and lost money or property, including but not limited the loss of California Class members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

153.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff's and California Subclass members' PII and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII of Plaintiff and the California Class members.

154.     Defendant is a corporation organized for the profit or financial benefit of its owners, with annual gross revenues exceeding $25 million, and collects PII as defined in Cal. Civ. Code § 1798.140.

155.     Plaintiff and California Subclass members seek relief under § 1798.150(a), including, but not limited to, recovery of actual damages; injunctive or declaratory relief; any other relief the court deems proper; and attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5).

156.     Plaintiff and the California Subclass members reserve the right to amend this Complaint as of right to seek statutory damages and relief under Cal. Civ. Code § 1798.100, *et seq.*

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, request judgment against the Defendant and that the Court grant the following:

A.     An order certifying the Nationwide Class and California Subclass as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.     An order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of Plaintiffs' and Class Members' PII;

C.     An award of compensatory, statutory, nominal, and punitive damages, in an amount to be determined;

D.     An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.     An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law; and

F.     Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

Date: November 11, 2020                  Respectfully Submitted,

                              By:      */s/ M. Anderson Berry*
                                       M. Anderson Berry (SBN 262879)
                                       aberry@justice4you.com
                                       Leslie Guillon (SBN 222400)
                                       lguillon@justice4you.com
                                       **CLAYEO C. ARNOLD,**
                                       **A PROFESSIONAL LAW CORPORATION**
                                       865 Howe Avenue
                                       Sacramento, CA 95825
                                       Telephone: (916) 777-7777
                                       Facsimile: (916) 924-1829

                                       John Yanchunis (*Pro Hac Vice Forthcoming*)
                                       jyanchunis@ForThePeople.com
                                       Ryan J. McGee (*Pro Hac Vice Forthcoming*)
                                       rmcgee@ForThePeople.com
                                       **MORGAN & MORGAN**
                                       **COMPLEX LITIGATION GROUP**
                                       201 N. Franklin Street, 7th Floor
                                       Tampa, Florida 33602
                                       Telephone: 813-559-4908
                                       Facsimile: (813) 222-4795

                                       *Attorneys for Plaintiffs and the Proposed Class*